# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**DERRICK WOODBERRY (#355771)**                              **CIVIL ACTION**

**VERSUS**

                                                          **22-979-BAJ-RLB**

**JAMES LEBLANC, ET AL.**

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law, and recommendations therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on February 5, 2024.

                                                   **RICHARD L. BOURGEOIS, JR.**
                                                   **UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**DERRICK WOODBERRY (#355771)**                    **CIVIL ACTION**

**VERSUS**
                                                   **22-979-BAJ-RLB**
**JAMES LEBLANC, ET AL.**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter comes before the Court on the Motion to Dismiss (R. Doc. 27) filed on behalf of all defendants with the exception of defendant Guerin[1]. The Motion is opposed. *See* R. Doc. 35.

The *pro se* Plaintiff, an inmate now incarcerated at David Wade Correctional Center ("Wade"), filed this proceeding pursuant to 42 U.S.C. § 1983 against James LeBlanc, Seth Smith, Kirt Guerin, Stephanie Michel, Jason Russ, Walter Jarrell, Donald Johnson, Craig White, Joe Buttross, Gregory Polozoa, Brandy Landry, Jason Linzy, and Stephanie Gaines complaining that his constitutional rights were violated in various ways due to retaliation. He seeks monetary, declaratory, and injunctive relief.

### Official Capacity Claims

#### *Monetary Damages*

Defendants first seek dismissal on jurisdictional grounds, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, of Plaintiff's § 1983 claims against them in their official capacities. In this regard, Defendants are correct that § 1983 does not provide a federal forum for a litigant who seeks monetary damages against either a state or its officials acting in their official capacities, specifically because these officials are not seen to be "persons" within the meaning of

---

[1] Defendant Guerin was served on August 7, 2023, but has not yet made an appearance. *See* R. Doc. 34.

§ 1983. *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989). In addition, in *Hafer v. Melo,* 502 U.S. 21 (1991), the United States Supreme Court addressed the distinction between official capacity and individual capacity lawsuits and made clear that a suit against a state official in an official capacity for monetary damages is treated as a suit against the state and is therefore barred by the Eleventh Amendment. *Id*. at 25. Accordingly, Plaintiff's § 1983 claims asserted against Defendants in their official capacities for monetary damages are subject to dismissal.

**Individual Capacity Claims**

Turning to Plaintiff's claims that are not subject to dismissal on the basis of Eleventh Amendment immunity, Defendants next assert, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, that Plaintiff has failed to state a claim upon which relief may be granted. In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court clarified the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss pursuant to Rule 12(b)(6). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, *supra*, at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, *supra*, 556 U.S. at 678, *quoting Bell Atlantic Corp. v. Twombly*, *supra*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. It follows that, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id*. at 679. "Where a Complaint pleads facts that are 'merely consistent with' a defendant's liability,

it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id*. at 678 (internal quotation marks omitted).

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the Complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Further, "[a] document filed *pro se* is 'to be liberally construed' ... and 'a *pro se* Complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Id*. (citation omitted). Notwithstanding, the court need not accept "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "naked assertions [of unlawful conduct] devoid of further factual enhancement." *Ashcroft v. Iqbal*, *supra*, 556 U.S. at 678 (internal quotation marks omitted).

### Plaintiff's Allegations

In his Complaint, the plaintiff alleges the following: While housed at Louisiana State Penitentiary ("LSP"), there was a disagreement between the plaintiff and inmate Reginald Evans about obtaining contraband from correctional employee Boeker. Evans and Boeker paid another inmate, Kendall Davis, to attack the plaintiff. The plaintiff was attacked by Davis on September 5, 2019, and was transferred to Hunt, where he was placed in solitary confinement for four days and then in extended lockdown for approximately a week before being transferred to the general population.

Weeks later, while housed at Hunt, the plaintiff was interviewed by defendant Landry and an FBI agent regarding the attack. During the interview the plaintiff learned that several officers at LSP were under investigation for corruption and other violations. Plaintiff further learned that he was moved to Hunt for his safety and to prevent retaliation.

After the plaintiff's counsel, Donna Grodner, sent a letter to DOC regarding the incident at LSP, former warden Barerre placed the plaintiff in solitary confinement twice. Defendant Landry had him released each time after being ordered to do so by Tim Hooper.

On August 12, 2020, the plaintiff and another inmate, Miller, filed PREA complaints against each other with defendant Landry. Defendant Landry immediately placed the plaintiff in disciplinary segregation. On August 20, 2020, the plaintiff's criminal counsel wrote a letter to Hooper regarding the denial of due process and the improper handling of the plaintiff's PREA complaint by defendant Landry. Defendant Landry then wrote a very charged, biased, and racially discriminatory report against the plaintiff and recommended that he be transferred to Wade.

After several days in disciplinary segregation, the plaintiff was brought before a disciplinary board and was found guilty of a Rule 30(c) violation. The plaintiff successfully appealed but the matter was remanded with instructions to address each individual rule violation. Plaintiff's counsel, Grodner, wrote a letter to defendant LeBlanc regarding the retaliatory acts of defendant Landry, and Hooper met with the plaintiff and assured him he was not being transferred. On October 7, 2020, the plaintiff appeared before a second disciplinary board, chaired by defendant Gaines, who informed the plaintiff that she was simply performing a ministerial task and that there would be no additional hearing. The plaintiff appealed but was informed that his appeal was not received.

On October 8, 2020, plaintiff's counsel contacted the office of Governor John Bel Edwards regarding the retaliatory actions of defendant Landry. The plaintiff then filed a complaint with the National PREA Auditor's Office and defendant Landry was infuriated. On October 13, 2020, the plaintiff was attacked by inmate Henry who yelled that the attack was for

the PREA incident with inmate Miller. Plaintiff submitted an emergency ARP the next day, and the screening officer contacted defendant Landry who reviewed the video footage. Defendant Landry then contacted Thomas who ordered defendant Johnson to place the plaintiff in solitary confinement.

On October 21, 2020, the plaintiff went before a disciplinary board and the report was dismissed. However, neither defendant Gaines nor another officer would allow the plaintiff to return to his quarters per the order of defendant Landry. Plaintiff's niece wrote a letter to defendant Landry, on October 27, 2020, regarding the plaintiff remaining housed in solitary confinement and the plaintiff was subsequently released.

In November and December of 2020, the plaintiff received threats from Davis and Evans through other inmates at Hunt. He filed a complaint as instructed by the FBI agent who had interviewed him in 2019. Plaintiff was again interviewed by an FBI agent on January 5, 2021, and expressed to the agent his concern that defendant Landry was divulging information to staff and inmates at Hunt.

Following the interview, the plaintiff was approached by defendant Donald Johnson who questions the plaintiff about the interview. Defendant Johnson asked the plaintiff if he knew a guy called "Scooby-Doo" which is Reginald Evans' nickname. Defendant Johnson then asked the plaintiff if he mentioned any officers to which the plaintiff replied that he had not. Defendant Johnson asked if the plaintiff was sure because he had been called by defendant Landry.

Plaintiff remained on restrictive housing status despite having completed the requirements to transfer to the transition program. Plaintiff could not be transferred because inmates were added to his enemy list by defendants Landry and Guerin.

In 2021 and 2022, a series of highly publicized stories were published concerning activities at Hunt after a large amount of drugs were discovered. Warden Todd Barerre was forced to abruptly retire. Around the same time, the plaintiff was waiting for a zoom conference to begin when he heard defendant Landry talking about him on the phone. Landry stated, "He did what? Wait Woodberry's right here," before retreating into her office.

Two days later, defendant Landry ordered that the plaintiff be searched for a cellphone because someone had been filing anonymous tips with the law enforcement and contacting the media about illegal drugs at Hunt. A cellphone was located, and the plaintiff pled guilty to possession of contraband. Around the same time a massive shake down was underway, and several officers were being investigated.

Upon his release, the plaintiff was forced to sign for his property before being able to inspect it. The plaintiff attempted to speak to defendant Landry about his missing property, but she refused to speak to him. The plaintiff then had another correctional officer ask defendant Landry to return his perishable items, and defendant Landry refused. On November 8, 2021, the plaintiff filed a Lost Property Claim.

Plaintiff was informed by another inmate to be careful of defendant Landry because she hated the plaintiff and that "her and Russ are on your trail." On December 6, 2021, following an email sent by the plaintiff's niece regarding the harassment by defendant Landry, Col. Robinson called the plaintiff to the Investigative Services office. Defendant Russ had asked Robinson to speak to the plaintiff, although she was not authorized to investigate a warden or assistant warden. Robinson took the plaintiff's complaint and told him to bring two written statements to prove defendant Landry was telling other inmates that he was a snitch. The plaintiff provided the statements.

On December 7, 2021, Robinson informed the plaintiff that the two inmates who made statements were going to recant, and that she had been instructed by defendant Russ not to proceed any further with the plaintiff's complaint. On December 15, 2021, Lt. Col. Woodberry attempted to get the plaintiff to drop his lost property claim. He stated that the paperwork was not signed, and that it was going to get ugly because, "Brandy Landry hates you, she's gonna get rid of you if you don't drop this." On January 14, 2022, defendant Russ told the plaintiff he had intended to grant his lost property claim but a lawyer had called his office requesting the administrative record. On February 14, 2022, someone from the internal affairs department at the DOC forwarded emails to defendant Russ' secretary, demanding copies of the documentation related to the property claim and stating that, without the documentation, the claim would have to be granted.

On February 15, 2022, Lt. Diaz ordered the plaintiff to bring a box of toilet paper to the D-1 cellblock. When the plaintiff arrived, Diaz asked the plaintiff to speak with an unruly inmate. The plaintiff was told to go outside to speak to the inmate at a window. When the plaintiff went back inside, he was strip searched and nothing was found. Diaz then informed the plaintiff that a sock containing several phone chargers was found outside. When speaking with defendant Johnson later, the plaintiff questioned why he was being sent to lockdown for the phone chargers when defendant Johnson had recently accepted payment from another inmate for a phone. The plaintiff was immediately sent for a walk-in disciplinary hearing.

On February 17, 2022, defendant Johnson discussed a "hit" on the plaintiff with inmate Thomas. Johnson offered to release Thomas from lockdown as payment for the "hit." Lt. Diaz later received informal disciplinary actions for his role in the events of February 15, 2022. In the subsequent investigation, defendant Johnson employed defendant Linzy to corroborate the report

even though no camera footage or other evidence supported a finding of guilt. Defendant

Johnson, at the direction of defendant Russ, also obtained additional statements from Lt. Diaz

and Bihm.

On March 3, 2022, the plaintiff was sanctioned to 45 days working cellblock. Most

offenders only received 30 days for contraband. Plaintiff then filed a grievance wherein

defendant Johnson was named. Upon learning of the ARP, defendant Johnson ordered Col.

Dugas to call the plaintiff to his office and have him withdraw the ARP. The plaintiff refused and

Col. Dugas told the plaintiff, "You are pissing Bo off."

On March 10, 2022, the plaintiff forwarded correspondence to defendant Jarrell asking

him to review the matter and order a polygraph for the plaintiff regarding the events of February

15, 2022. Defendant Jarrell did not respond. The plaintiff later spoke to defendants Johnson and

Jarrell, and Jarrell advised that he had not seen the letter, but he would look into it and possibly

have Johnson do the same. On March 14, 2022, the plaintiff was awakened and searched. No

contraband was found. Minutes later as the plaintiff was walking past defendant Johnson's

office, Johnson said, "You beat that shakedown I sent you." Later the same day, the plaintiff

deduced that defendant Johnson was taking monetary bribes. Plaintiff was later called to

defendant Johnson's office and asked him to give defendant Russ and Guerin a message. The

plaintiff later learned that defendant Johnson had told another inmate that he had the plaintiff

'knocked off' but the plaintiff had gotten past the shakedown. Defendant Johnson also stated that

he was going to get the plaintiff for putting his name in an ARP with Lt. Diaz and refusing to

drop it.

From March 17-20, 2022, defendant Jarrell sent letters and emails to defendant Johnson

concerning the plaintiff's false disciplinary report. Defendant Johnson replied and defendant

Russ was copied. Several days later, the plaintiff spoke with defendant Jarrell in the presence of defendant Johnson, and defendant Johnson stated that he was unable to overturn the disciplinary report because defendant Russ, his supervisor, was going to question the decision. Defendant Jarrell said that instead the plaintiff would be made a trustee in May. Defendant Johnson wrote on his calendar, "Woodberry – May." Thereafter, defendant Johnson began to harass the plaintiff more frequently. He assigned the plaintiff to do work outside his designated job as a hobby shop orderly. Defendant Johnson took pictures of the plaintiff with his personal cellphone.

On April 16, 2022, as the plaintiff was leaving the hobby shop he was ordered by defendant Johnson to remain outside for the night. Defendant Johnson asked plaintiff if he knew any individuals from the N. 38th street area who were in federal prison. The plaintiff did not know any such individuals. Defendant Johnson told the plaintiff he had been approached by someone at his former residence, which was up for sale, who had a $50,000 cashier's check and asked if the plaintiff was located at Hunt. Defendant Johnson stated that he needed to do a quick deed on his house because the "feds" were investigating Hunt. He then wrote his retirement date on the wall – April 1, 2024.

On April 13, 2022, defendant Johnson told inmate Davis that he didn't trust the plaintiff and was keeping an eye on him until he could get rid of him. He then planned a "hit" on the plaintiff with inmate Davis. On April 20, 2022, defendant Johnson was visibly upset and erratic. He told the plaintiff that he suspected him of being a snitch, and that he believed the plaintiff was responsible for his friend being in federal prison. Defendant Johnson also told the plaintiff that he hated snitches, that the plaintiff wouldn't be there when Johnson returned from vacation, and that the plaintiff was f@cking with his life. Defendant Johnson further stated that he was requesting a transfer from Hunt.

On April 21, 2022, per the instructions of defendant Johnson, inmate Jones attacked the plaintiff. Plaintiff, in return, stabbed Jones. Defendant Johnson was contacted and ordered that the plaintiff remain housed on suicide watch while he worked to get the plaintiff transferred from Hunt. Plaintiff requested to speak with a PREA investigator due to comments made by inmate Jones. Defendant Linzy and another officer interviewed the plaintiff and told him that he would be transferred from Hunt per defendant Johnson's request to defendant Russ. Plaintiff requested that defendant Linzy preserve the video footage that would show he was attacked by Jones. A disciplinary hearing was held but the plaintiff was not present.

On April 23, 2022, the plaintiff wrote to defendant Linzy regarding defendant Johnson's corruption. On April 26, 2022, he wrote to defendants LeBlanc and Smith regarding the same. The plaintiff's disciplinary hearing was continued so that defendant Linzy could conduct an investigation. On April 28, 2022, defendant Johnson returned early from vacation, and the plaintiff was told by another officer, "He came back here specifically to see you, he said you wrote Guerin so Russ called him to his office." While making rounds, defendant Johnson spoke with inmate Thomas and told Thomas that he had arranged for another inmate, Depton "G-Red" Jones, to handle a hit on the plaintiff because he was concerned that the plaintiff would rat on him and file grievances. Defendant Johnson also told inmate Thomas that he was going to make sure the plaintiff was transferred from Hunt. On the same date defendant Johnson also spoke to inmate Smith and stated, " I told you that n***a was gonna be gone when I came back to work."

Later that evening, the plaintiff was moved to a single man cell per the order of defendant Johnson. On April 29, 2022, defendants Johnson and Buttross, with the approval of defendants Jarrell and Russ, transferred one of the plaintiff's enemies to general population so that the plaintiff would have to remain in a more restricted area. On May 1, 2022, the plaintiff's niece

contacted defendant Geurin via email regarding the possible retaliatory transfer. Defendant Guerin responded that there was no order for the plaintiff to be transferred.

The plaintiff appeared before a disciplinary board on May 6, 2022. Defendants Gaines and Polozoa were the board chairs. Defendant Linzy filed a false investigation report per the orders of defendants Landry, Russ, and Johnson. The plaintiff was not allowed to present a defense. He was found guilty and sentenced to 180 days in disciplinary segregation and 12 weeks loss of canteen.

On May 20, 2022, the plaintiff's ARP regarding defendant Johnson was rejected for being too general. The plaintiff submitted a revised ARP that was rejected as untimely. The plaintiff then wrote to defendants Russ, LeBlanc, Guerin, and Michele asking them to review the rejection of his ARP. No response was received. The plaintiff then filed a formal complaint with the Inspector General. Plaintiff also wrote several letters to defendant Michel, Gaines, Buttross, and LeBlanc about the hit ordered by defendant Johnson and his other actions. Defendant Buttross then attempted to move the plaintiff to another tier, but as soon as the plaintiff was on the tier the other inmates began shouting, "Bo said he a rat," and made threats. Lt. Watts returned the plaintiff to his prior housing, logged a request for protection, and notified his supervisor.

Plaintiff was forced to wait days to sign a formal request for protection because officers did not want the plaintiff to mention defendant Johnson in the form. At the protection hearing on June 24, 2022, defendant Gaines refused to listen and stated that the plaintiff's letters to her about a hit ordered by defendant Johnson were "all a game." On June 29, 2022, the plaintiff wrote to defendant Jarrell to inquire why he refused to investigate the actions of defendants Johnson and Landry. The plaintiff also had a zoom conference with DOC counsel Johnathan

Vining. The plaintiff relayed his complaints to Vining who advised the plaintiff to send a letter that he would ensure was received by the appropriate DOC official.

On June 30, 2022, the plaintiff received the administrative record in the civil action instituted in state court regarding his lost property. The record contained several emails between Kris Hensley and Tara Dennis, defendant Russ' secretary, demanding documentation about the plaintiff's lost property. The dates of the emails coincided with the time frame of the shakedowns, false reports, defendant Russ watching the plaintiff on camera, the job changes, and the intensified harassment by defendant Johnson. On the same date, the plaintiff wrote to defendant Russ to tell him he was in receipt of the emails and that he shocked to learn that he was colluding with defendant Johnson to retaliate against him for filing lawsuits and complaints.

After several erroneous rejections, the plaintiff's ARP against defendant Johnson was finally accepted on July 12, 2022. The plaintiff attempted to supplement this ARP, but the supplement was rejected as a duplicate complaint by defendants Polozoa, Russ, and Michel.

Plaintiff continued to seek the return of his legal and religious materials from his property. The property could not be located. On July 18, 2022, defendant White told the plaintiff that he had just left the warden's meeting that defendant Russ was "pi$$ed" at the plaintiff because he wrote to the governor about defendant Johnson. Defendant White threatened to transfer the plaintiff to Wade if he did not drop his ARPs and lawsuit. The plaintiff told defendant White that defendant Guerin said he was not being transferred to which defendant White replied, "Guerin's gone, they forced him out, made him retire. Stephanie Michel is acting warden, Russ calling the shots." Defendant White further stated that a list was being made of who to transfer to Wade and that the plaintiff should either make his peace with that or drop the ARPs and lawsuit. The plaintiff refused.

On July 25, 2022, tactical officers came to the plaintiff's cell and ordered that the plaintiff be transferred to Wade. Defendant White and Lt. Col. Lane came to the plaintiff's cell, and he inquired about his personal property. Lane said that it had been found and that defendant Johnson had been playing games with the documentation. Defendant White told the plaintiff that he should have dropped his claims, and if he had then he wouldn't be going to Wade. The plaintiff had remained in segregation for 135 days until he was transferred to Wade on July 25, 2022.

Upon transfer to Wade the plaintiff was placed in preventative segregation and was kept there per the orders of defendants LeBlanc and Smith. The plaintiff was transferred to Wade despite having several known enemies (Evans and Davis) who were housed in close proximity and were co-mingled with the plaintiff for recreation and call outs. The plaintiff wrote numerous letters to defendant LeBlanc and Smith about his safety concerns and threats received from Evans and Davis. The plaintiff was still in restrictive housing at Wade at the time of the filing of his Complaint.

### *Qualified Immunity*

In response to the plaintiff's allegations, Defendants assert that they are entitled to qualified immunity in connection with Plaintiff's claims. The qualified immunity defense is a familiar one and, employing a two-step process, operates to protect public officials who are performing discretionary tasks. *Huff v. Crites*, 473 F. App'x. 398 (5th Cir. 2012). As enunciated in *Saucier v. Katz*, 533 U.S. 194 (2001), the first step in the analysis is to consider whether, taking the facts as alleged in the light most favorable to the plaintiff, the defendant's conduct violated the plaintiff's constitutional rights. *Id.* at 201. Second, the district court looks to whether the rights allegedly violated were clearly established. *Id.* This inquiry, the Court stated, is

undertaken in light of the specific context of the case, not as a broad, general proposition. *Id*. The relevant, dispositive inquiry in determining whether a constitutional right was clearly established is whether it would have been clear to a reasonable state official that his conduct was unlawful in the situation which he confronted. *Id*.

Undertaking the qualified immunity analysis, the Court finds that Defendants' motion should be granted, in part and denied in part. Plaintiff's allegations, accepted as true, state claims for retaliation against defendants Landry, Russ, Johnson, and Linzy.

### Verbal Abuse/Threats

To the extent the plaintiff complains of verbal abuse and/or threats made by any defendant, neither threats nor verbal abuse by a security officer is actionable under § 1983. *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002) ("[C]Iaims of verbal abuse are not actionable under § 1983"); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) ("It is clear that verbal abuse by a prison guard does not give rise to a cause of action under § 1983"); *Bender v. Brumley*, 1 F.3d 271, 274 n. 4 (5th Cir. 1993) ("Mere allegations of verbal abuse do not present actionable claims under § 1983").

### Deprivation of Property

Whether intentional or negligent, the "random and unauthorized" deprivation of property neither violates the Constitution nor states a claim under 42 U.S.C. § 1983 when adequate state post-deprivation remedies are available. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Louisiana law provides plaintiff the opportunity to seek redress for either the alleged negligence or intentional torts committed by these public officials. *See* Louisiana Civil Code Article 2315. This provision of state law, which is the general tort provision of Louisiana's Civil Code, provides all the process that is required, and thus, the Fourteenth Amendment is not implicated. *Charbonnet*

*v. Lee,* 951 F.2d 638 (5th Cir. 1992). Because the plaintiff has available post-deprivation remedies through the state courts, his claim based on the alleged taking of his personal property, fails to state a claim under *Hudson.*

### *Grievance and Disciplinary Proceedings*

With regards to the plaintiff's complaints about his disciplinary and grievance proceedings, an inmate does not have a constitutional right to have his prison disciplinary or administrative proceedings (including informal complaints) properly investigated, handled, or favorably resolved, *Mahogany v. Miller,* 252 F. App'x. 593, 595 (5th Cir. 2007), and there is no procedural due process right inherent in such a claim. As stated by the United States Court of Appeal for the Fifth Circuit in *Geiger v. Jowers,* 404 F.3d 371 (5th Cir. 2005) (in the context of the handling of an administrative grievance):

> Insofar as [the plaintiff] seeks relief regarding an alleged violation of his due process rights resulting from the prison grievance procedures, the district court did not err in dismissing his claim as frivolous…[The plaintiff] does not have a federally protected liberty interest in having these grievances resolved to his satisfaction. As he relies on legally nonexistent interest, any alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless. *Id.* at 373-74.

This conclusion is equally applicable in the context of prison disciplinary proceedings. *See, e.g., Sanchez v. Grounds,* 2014 WL 1049164, *2 (E.D. Tex. Mar. 14, 2014) (finding that an inmate's claim regarding a failure to conduct a "proper investigation" of a disciplinary charge "did not amount to a constitutional deprivation"); and *Jackson v. Mizell,* 2009 WL 1792774, *7 n.11 (E.D. La. June 23, 2009) (noting that "the Court fails to see how a prisoner could ever state a cognizable claim alleging an inadequate disciplinary investigation").

Further, the failure of prison officials to follow prison rules or regulations does not amount to a violation of Plaintiff's constitutional rights. *Jackson v. Cain*, 864 F.3d 1235, 1252

(5th Cir. 1989). Nor does this Court sit as some form of an appellate court to review errors made by state tribunals that do not affect an inmate's constitutional rights. *See, e.g., Coleman v. Director, TDCJ-CID,* 2009 WL 56947, *2 (E.D. Tex. Jan. 7, 2009) (noting, in the context of an inmate's habeas corpus proceeding arising out of a prison disciplinary proceeding, that "[i]n the course of reviewing state proceedings, a federal court does not sit as a super state appellate court.").

Moreover, in *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court noted that, in some rare situations, an inmate may be entitled to procedural Due Process when state action exceeds the sentence in such an unexpected way as to give rise to protection by the Due Process Clause of its own force. Normally, however, the Due Process Clause, itself, does not afford an inmate a protected liberty interest that would entitle him to the procedural protections set forth in *Wolff v. McDonnell*, 418 U.S. 539 (1974). It is only those restrictions that impose "atypical and significant hardship[s] ... in relation to the ordinary incidents of prison life" that will invoke the prospect of state-created liberty interests. *Wilkinson v. Austin*, 545 U.S. 209, 222–23 (2005).

Thus, while *Sandin* made it clear that punishments that impact upon the duration of confinement, or which exceed the sentence in an unexpected manner, or that impose "atypical and significant hardship[s] ... in relation to the ordinary incidents of prison life" will give rise to the protection afforded by the Due Process Clause, more routine disciplinary action will not invoke this constitutional protection. *Sandin,* 515 U.S. at 484. In the instant case, Plaintiff was sentenced to disciplinary segregation. This punishment does not amount to disciplinary action that infringes upon a constitutionally-protected liberty interest that would invoke the protection

of the Due Process Clause of the Fourteenth Amendment.[2] According, the plaintiff has failed to state a claim upon which relief may be granted with regards to his disciplinary and grievance proceedings.

### *Conditions of Confinement*

To the extent the plaintiff complains of being housed in restrictive areas of the prison, the 14th Amendment to the United States Constitution protects against deprivations of life, liberty, and property without due process of law. As a general rule, "[a]n inmate has neither a protectible property nor liberty interest in his custody classification." *Moody v. Baker*, 857 F.2d 256, 257–58 (5th Cir. 1988) (per curiam). Great deference is accorded to prison officials in their determination of custodial status. *See Wilkerson v. Goodwin*, 774 F.3d 845, 852 (5th Cir. 2014). Thus, "absent extraordinary circumstances, administrative segregation as such, being an incident to the ordinary life as a prisoner, will never be a ground for a constitutional claim." *Pichardo v. Kinker*, 73 F.3d 612, 612 (5th Cir. 1996). In other words, segregated confinement is not grounds for a due process claim unless it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). We look specifically at the severity and duration of restrictive conditions to decide whether a prisoner has a liberty interest in his custodial classification. *Wilkerson*, 774 F.3d at 854–55; *accord Bailey v. Fisher*, 647 F. App'x 472, 476–77 (5th Cir. 2016).

"In deciding whether changes to an inmate's conditions of confinement implicate a cognizable liberty interest, both *Sandin* and [*Wilkinson*] considered the *nature* of the more-

---

[2] Examples of prison hardships that would qualify as atypical and significant include unwanted administration of anti-psychotic drugs, involuntary commitment to a mental hospital, and extension of the prisoner's sentence for his underlying criminal conviction. *Sandin*, 515 U.S. at 484; *see Wilkinson v. Austin*, 545 U.S. 209, 223-24 (2005) (addressing solitary confinement in a "Supermax" facility imposed an atypical and significant hardship to a protected liberty interest based on the existence of extenuating circumstances, including disqualification of an otherwise eligible inmate from parole consideration).

restrictive confinement and its *duration* in relation to prison norms and to the terms of the

individual's sentence." *Wilkerson,* 774 F.3d at 853 (*quoting Harden–Bey v. Rutter,* 524 F.3d 789,

792 (6th Cir.2008). "In essence, courts employ a sliding scale, taking into account how bad the

conditions are and how long they last." *Bailey v. Fisher*, 647 F. App'x  at 476 . "On such a

sliding scale, truly onerous conditions for a brief period of time may not be atypical; less onerous

conditions for an extended period of time may be." *Id.* The "Fifth Circuit recently suggested that

two and a half years of segregation is a threshold of sorts for atypicality, such that 18-19 months

of segregation under even the most isolated of conditions may not implicate a liberty interest."

*Id.* (citing *Wilkerson*, 774 F.3d at 855).

A liberty interest has been found when a prisoner is incarcerated in super-maximum

security conditions for a lengthy or indeterminate duration. *See, e.g., Wilkinson v. Austin*, 545

U.S. 209, 214, 223–24 (2005) (finding that prisoner's transfer to an Ohio "supermax" facility

implicated a liberty interest, in part because (1) the conditions were "more restrictive than any

other form of incarceration in Ohio"; (2) confinement in supermax was indefinite; and (3)

otherwise eligible inmates were disqualified for parole consideration while incarcerated in

supermax); *Wilkerson v. Goodwin*, 774 F.3d 845, 855–56 (5th Cir. 2014) (finding that thirty-nine

years in solitary confinement was an atypical and significant hardship constituting a liberty

interest).

None of the vague conditions alleged by the plaintiff, alone or taken together, are

sufficiently severe to give rise to a liberty interest under *Sandin.* Utilizing the directives set forth

in *Wilkerson* and *Wilkinson*, the plaintiff's allegations fail to show extraordinary circumstances

which would render Plaintiff's confinement an "atypical and significant hardship" on him in

relation to the "ordinary incidents of prison life." As such, the plaintiff has failed to state a claim in this regard.

### *Retaliation*

Turning to the plaintiff's retaliation claim, it is prohibited for prison officials to act against an inmate in retaliation for the inmate's exercise of his constitutional rights. *See Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir. 1995). The purpose of allowing retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising their constitutional rights. *Morris v Powell*, 449 F.3d 682, 686 (5th Cir. 2006). Claims of retaliation by prison inmates, however, are regarded with skepticism, lest the federal courts potentially embroil themselves in every adverse action that occurs within a penal institution. *Woods v. Smith, supra*, 60 F.3d at 1166. Accordingly, to prevail on a claim of retaliation, a prisoner must establish (1) that he was exercising or attempting to exercise a specific constitutional right, (2) that the defendant intentionally retaliated against the prisoner for the exercise of that right, (3) that an adverse retaliatory action, greater than *de minimis*, was undertaken against the prisoner by the defendant, and (4) that there is causation, *i.e.*, that "but for" the retaliatory motive, the adverse action would not have occurred. *Morris v. Powell, supra*, 449 F.3d at 684. *See also Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003); *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999). An inmate must allege more than his mere personal belief that he is the victim of retaliation, *Johnson v. Rodriguez*, 110 F.3d 299 (5th Cir. 1997), and inasmuch as claims of retaliation are not favored, it is the plaintiff's burden to provide more than conclusory allegations of retaliation:

> To state a claim of retaliation an inmate must ... be prepared to establish that but for the retaliatory motive the complained of incident ... would not have occurred. This places a significant burden on the inmate.... The inmate must produce direct

evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred.

*Woods v. Smith, supra*, 60 F.3d. at 1166.

Undertaking the foregoing analysis, the Court finds that the plaintiff has alleged that there is direct evidence of motivation or a chronology of events from which retaliation may be plausibly inferred by certain defendants with regards to his lost property claim and grievance filed regarding defendant Johnson.

### The PREA Complaint

Plaintiff alleges that he and another inmate filed PREA complaints against each other on August 12, 2020, almost one year after the plaintiff had been transferred to Hunt and interviewed by defendant Landry and an FBI agent about an incident at LSP. After the PREA complaints were filed, defendant Landry immediately placed the plaintiff in disciplinary segregation. On August 20, 2020, counsel for plaintiff wrote a letter to Tim Hooper regarding the denial of due process and the improper handling of the PREA complaint by defendant Landry. Defendant Landry then wrote a "charged, biased, and racially discriminatory report" against the plaintiff and recommended that he be transferred. While the plaintiff was not transferred, he was subsequently found guilty of a Rule 30(c) violation and was sentenced to 60 days in disciplinary segregation.

Plaintiff's counsel then, on October 8, 2020, contacted the office of Governor Edwards regarding the actions of defendant Landry, and the plaintiff filed a complaint with the National PREA Auditor's Office. This infuriated Landry and days later, on October 13, 2020, the plaintiff was attacked by another inmate who yelled that the attack was for the PREA incident. The plaintiff submitted an emergency ARP the next day, and defendant Landry ordered that the plaintiff be placed in solitary confinement after reviewing the video footage. The disciplinary

report was dismissed, but the plaintiff was not allowed to return to less restrictive housing per the order of defendant Landry. The plaintiff was released after his niece wrote a letter, on October 27, 2020 to defendant Landry.

The foregoing claims prescribed prior to the plaintiff filing suit in this matter. Inasmuch as there is no federal statute of limitations for claims brought pursuant to 42 U.S.C. § 1983, a federal court must borrow the forum state's general personal injury limitations period for such claims. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). In Louisiana, the applicable period of limitations is one year. La. Civ. Code Art. 3492.[3] Moreover, under federal law, a cause of action under 42 U.S.C. § 1983 accrues "when the aggrieved party has either knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge thereof." *Piotrowski v. City of Houston*, 51 F.3d 512, 516 (5th Cir. 1995) (citations and internal quotation marks omitted). A plaintiff need not realize that a legal cause of action exists but must only have knowledge of the facts that support a claim. *Id.* Under Louisiana law, a party pleading a limitations defense normally has the burden of establishing the elements of that defense. *See Savoy v. St. Landry Parish Council*, 2009 WL 4571851, *3 (W.D. La. Dec. 1, 2009). However, when the face of the plaintiff's complaint reflects that more than a year has passed since the events complained of, the burden of proof shifts to the plaintiff to show that the limitations period has been interrupted or tolled. *Id.*

For claims of retaliation, prescription begins to run on the date of the alleged retaliatory act or the date the plaintiff becomes aware of said act. *See Davis v. Young,* 624 F. App'x. 203 (5th Cir. 2015) (claim for retaliatory transfer accrued on the date of the transfer); *Meyer v. Coffey*, 231 F. Supp. 3d 137 (N.D. Tex. 2017) (claims, including First Amendment retaliation,

---

[3] *See* La. Civ. Code Art. 3456

accrued on the date the plaintiff was searched and seized); and *Reynolds v. City of Dallas,* 2004 WL 893425 (N.D.Tex. April 23, 2004) (retaliation claim accrued on the date the plaintiff learned that he was not being promoted due to retaliation for engaging in protected speech).

In the instant matter, the plaintiff's claims against defendant Landry for retaliation with regards to the PREA Complaint accrued as early as August of 2020 and as late as October of 2020. As such, these claims prescribed on year from the dates that they occurred – August/October of 2021. In computing the applicable limitations period, this Court is obligated to take into account the time during which the administrative proceedings were pending within the prison system. *See Harris v. Hegmann*, 198 F.3d 153, 158-59 (5th Cir. 1999) (finding that the pendency of a properly-filed administrative grievance will act to toll or suspend the running of the one-year limitations period for a prisoner's claim).

The filing of an administrative grievance, however, only tolls or suspends, and does not interrupt, the running of the prescriptive period. *See* La. R.S. 15:1172(E) (providing that the limitations period for a prisoner's claim "shall be suspended upon the filing of [an administrative] ... grievance and shall continue to be suspended until the final agency decision is delivered"). Thus, this Court is required to count against Plaintiff the passage of days that elapsed both before the filing of the pertinent administrative grievance and after the conclusion of the administrative proceedings. *See Adams v. Stalder*, 934 So.2d 722, 725-26 (La. App. 1st Cir. 2006) (explaining that with a suspension of the limitations period, in contrast to an interruption, "the period of suspension is not counted toward the accrual of prescription but the time that has previously run is counted.... In other words, ... the clock merely stops running during the suspension, and thereafter the obligee has only so much of the one year as was remaining when the suspension began").

Grievances must be filed within a 90-day period after an incident has occurred. *See* 22 La. Admin. Code, Part I, § 325(G)(1). Then no more than 90 days may pass from the start to the completion of the process, unless an extension has been granted. *See* 22 La. Admin. Code, Part I, § 325(J)(1)(b). Further, an inmate may proceed to the next step without waiting for a response once the time allowed for a response has passed at any step of the administrative process. *See* 22 La. Admin. Code, Part I, § 325(J)(1)(c). The plaintiff did not file suit until November 23, 2022, more than 752 days after the last complained of retaliatory act regarding the PREA complaint. Assuming the plaintiff filed his grievance at the earliest possible time in October of 2020, prescription would have been suspended until January of 2021. Since the plaintiff did not file suit until November 23, 2022, more than one year of time elapsed between the latest occurring alleged act of retaliation and the filing of the Complaint herein. Under no circumstances would the grievance proceeding tolled enough time to render these claims timely. As such, the plaintiff's claims against defendant Landry, regarding the PREA complaint, prescribed prior to the filing of the Complaint herein.

*Second FBI Interview/More Restrictive Housing*

The plaintiff alleges that in January of 2021 he was interviewed for a second time by an FBI agent. Defendant Johnson seemed concerned about the interview and questioned the plaintiff. Thereafter the plaintiff was required to remain in more restrictive housing, rather than being transferred to the transition program, because two inmates were added to his enemy list by defendants Landry and Guerin.

The plaintiff described his housing as restrictive without further elaboration. He does not state that it was more dangerous or restrictive than his prior unit. As such, the plaintiff does not allege more than a *de minimis* adverse act. Additionally, the plaintiff does not allege that but for

the retaliatory intentions of defendants Johnson, Landry, and Guerin the alleged retaliatory act would not have occurred. The plaintiff instead alleges that he could not be transferred because inmates were added to his enemy list, at least one of which who had previously attacked the plaintiff. As such, the plaintiff fails to state a claim for retaliation in this regard. *See Escobarrivera v. Whitaker*, 2022 WL 17352178 (5th Cir. 2022) (affirming dismissal of retaliation claim in the absence of facts supporting actual retaliation).

*Search for Cellphone*

In October of 2021, a massive shakedown of the prison was underway. Due the large amount of contraband found, Deputy Warden Todd Barerre was forced to abruptly retire. Around the same time, the plaintiff was waiting for a zoom conference when he overhead defendant Landry say to someone on the phone, "He did what? Wait Woodberry's right here." She then retreated into her office. Two days later, on October 29, 2021, defendant Landry watched the plaintiff on the cameras and then ordered that the plaintiff be searched for a cellphone because someone was filing anonymous tips with law enforcement and contacting the media about illegal drugs at Hunt. A cellphone was located, and the plaintiff plead guilty to possession of contraband.

Items that cannot be shown to have a legitimate source are considered contraband. Plaintiff cannot show that, but for the alleged retaliatory motive, his undocumented "contraband" would not have been seized during a routine cell search, especially given the massive shakedown being conducted in the prison. As such, the plaintiff cannot establish the requisite causation for the search or the subsequent disciplinary charge. *See Brown v. Craven,* 106 F. App'x 257 (5th Cir. 2004) (Undocumented contraband would have been seized during routine search; therefore, inmate could not prove retaliatory motive).

*Lost, Missing or Withheld Property*

Upon his release following the disciplinary conviction, the plaintiff alleges that he was required to sign for his property prior to inspecting it and some of his property was missing. Defendant Landry refused to return his perishable items or discuss the missing items. The plaintiff filed a Lost Property Claim. On December 15, 2021, Lt. Col. Woodberry attempted to get the plaintiff to drop his claim and remarked that defendant Landry hated the plaintiff and was going to get him if he didn't drop the claim. On January 14, 2022, defendant Russ told the plaintiff he had intended to grant the claim, but a lawyer had called his office to obtain the administrative record.

On February 14, 2022, someone from the internal affairs department at the DOC forwarded emails to defendant Russ' secretary, demanding copies of the documentation related to the property claim and stating that, without the documentation, the claim would have to be granted. On July 25, 2022, the plaintiff was informed that defendant Johnson had been playing games with the documentation and that his property had been located.

The plaintiff has not alleged any facts demonstrating direct evidence of retaliation on the part of defendant Johnson, or a chronology of events from which retaliation can be inferred. The plaintiff alleges only that, nine months prior, defendant Johnson expressed concern after the plaintiff was interviewed by an FBI agent. However, as explained further below, the plaintiff has sufficiently alleged that he was retaliated against for filing a lost property claim.

*Lost Property Claim*

The plaintiff filed a lost property claim on November 8, 2021. The plaintiff was subsequently informed by another inmate to be careful of defendant Landry because she hated the plaintiff and that "her and Russ are on your trail." On December 7, 2021, Robinson informed

the plaintiff that he had been instructed by defendant Russ to stop investigating the plaintiff's complaint of harassment by defendant Landry. On December 15, 2021, Lt. Col. Woodberry attempted to get the plaintiff to drop his lost property claim stating, "Brandy Landry hate you, she's gonna get rid of you if you don't drop this." On January 14, 2022, defendant Russ told the plaintiff he had intended to grant his lost property claim but a lawyer had called to request the record. On February 14, 2022, someone from internal affairs at the DOC forwarded emails to defendant Russ' secretary demanding copies of the documentation related to the plaintiff's lost property claim.

On February 15, 2022, Lt. Diaz told the plaintiff to go outside to speak to an unruly inmate at a window. When the plaintiff went back inside, he was strip searched and nothing was found. Diaz then informed the plaintiff that a sock containing several phone chargers was found outside. The plaintiff was subsequently found guilty of possession of contraband and sentenced to 45 days in the working cell block after defendant Johnson employed defendant Linzy to corroborate the false report. Defendant Johnson, at the direction of defendant Russ, also obtained additional statements to corroborate the charge even though there was no camera footage or other evidence to support a finding of guilt on the part of the plaintiff. On February 17, 2022, defendant Johnson discussed a "hit" on the plaintiff with inmate Thomas.

The plaintiff has set forth a chronology of events from which it is plausible to infer that he was retaliated against for the filing of a lost property claim. The plaintiff alleges that he was stripped searched, and convicted of a false disciplinary charge resulting in custody status change after he refused to drop his property claim and pressure was placed on the defendants to provide documentation related to the property claim. As such, accepting the plaintiff's allegations as true,

the plaintiff has stated a claim for retaliation against defendants Landry, Russ, Johnson, and Linzy.

*ARP against Defendant Johnson – Attack, Segregation, and Transfer*

After the plaintiff was sentenced, on March 3, 2022, to 45 days in the working blocks the plaintiff filed a grievance against defendant Johnson. When defendant Johnson learned of the grievance, he ordered Col. Dugas to call the plaintiff to his office to have the plaintiff withdraw the grievance. The plaintiff refused and Col. Dugas told the plaintiff that he was angering defendant Johnson.

On March 10, 2022, the plaintiff spoke to defendants Johnson and Jarrell about the matter. On March 14, 2022, the plaintiff was awakened and searched. Defendant Johnson told the plaintiff, "You beat that shakedown I sent you." Defendant Johnson also told another inmate that he was trying to have the plaintiff "knocked off" and that he was going to get the plaintiff for putting his name in the grievance and refusing to drop it. Defendant Johnson later told the plaintiff he couldn't overturn the disciplinary charge because his supervisor, defendant Russ, would question the decision. Instead, defendant Jarrell told the plaintiff that he would be made a trustee in May. Thereafter, defendant Johnson began to harass the plaintiff more frequently.

Defendant Johnson assigned work to the plaintiff outside of his designated job. He took pictures of the plaintiff on his personal cellphone. On April 9, 2022, defendant Johnson implied that he was approached for information about the plaintiff in exchange for money. On April 13, 2022, defendant Johnson told inmate Davis that he didn't trust the plaintiff and was keeping an eye on him until he could get rid of him. He then planned a "hit" on the plaintiff with inmate Davis. On April 20, 2022, defendant Johnson was visibly upset and erratic as he told the plaintiff he was snitch, was responsible for his friend being in federal prison, that the plaintiff wouldn't be

there when he returned from vacation, and that the plaintiff was f@cking with his life. Defendant Johnson further stated that he was requesting that the plaintiff be transferred from Hunt.

The next day, the plaintiff was, per the instructions of defendant Johnson, attacked by inmate Jones. The plaintiff, in return, stabbed inmate Jones. Defendant Johnson ordered that the plaintiff remain housed on suicide watch. Defendant Linzy and another officer interviewed the plaintiff and told him he would be transferred per defendant Johnson's request to defendant Russ. Thereafter the plaintiff began to write to various people about defendant Johnson. Defendant Johnson returned early from vacation on April 28, 2022, after being called back by defendant Russ due to the plaintiff's correspondence. Upon his return, defendant Johnson told inmate Thomas that he had arranged for the plaintiff to be attacked by Jones and that he was going to make sure the plaintiff was transferred. He then had the plaintiff moved to a single man cell.

On May 6, 2022, the plaintiff appeared before a disciplinary board regarding the attack. Defendant Linzy filed a false investigation report per the orders of defendants Landry, Russ, and Johnson. The plaintiff was found guilty and sentenced to 180 days in disciplinary segregation and 12 weeks loss of canteen. After being rejected several times, the plaintiff's grievance against Johnson was finally accepted on July 12, 2022. On July 18, 2022, defendant White told the plaintiff that defendant Russ was angry about a letter the plaintiff had written to the governor, and threatened to transfer the plaintiff to Wade if he did not drop his grievance and property lawsuit. Defendant White further stated that a list was being made of who to transfer to Wade and that the plaintiff should either make his peace with it or drop his complaints. The plaintiff refused.

On July 25, 2022, the plaintiff was transferred to Wade despite having several known enemies (Evans and Davis). These enemies were housed in close proximity and were co-mingled with the plaintiff for recreation and callouts, even though the plaintiff was housed in preventative segregation. He received threats from these enemies and was concerned for his safety. The plaintiff was still in restrictive housing at the time his Complaint was filed on November 23, 2022.

The plaintiff has set forth a chronology of events from which it is plausible to infer that he was retaliated against for the filing of a grievance against defendant Johnson. The plaintiff alleges that he was physically attacked, convicted of a false disciplinary charge, and transferred to a prison where two known enemies were housed and with whom he is comingled and has been threatened by. Although a prisoner has no constitutionally protected interest in a particular facility or a specific work assignment, transfer to a more dangerous prison is an adverse act capable of deterring a person of ordinary firmness from further exercising his constitutional rights. *See Bibbs v. Early*, 541 F.3d 267, 271 (5th Cir. 2008) and *Morris v. Powell*, 449 F.3d 682, 687 (5th Cir. 2006). As such, accepting the plaintiff's allegations as true, the plaintiff has stated a claim for retaliation against defendants Landry, Russ, Johnson, and Linzy.

### *Failure to Protect*

As discussed above, the plaintiff alleges that defendant Johnson arranged for the plaintiff to be attacked by inmate Jones in retaliation for the filing of a grievance. Under the Eighth Amendment to the United States Constitution, a prisoner has a constitutional right to be sheltered from the threat of harm or violence at the hands of other inmates. *Johnston v. Lucas*, 786 F.2d 1254, 1259 (5th Cir. 1986); *Jones v. Diamond*, 636 F.2d 1364, 1373 (5th Cir. 1981). Specifically, prison officials "have a duty ... to protect prisoners from violence at the hands of other inmates."

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "Deliberate indifference" is the appropriate standard to be applied in this context, and this term has been defined as including an element of "subjective recklessness" as used in the criminal law. *Id.* at 837. A prison official may be held liable under the Eighth Amendment for acting with deliberate indifference to an inmate's health or safety only if he knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Id. at 847*. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference. *Id.* at 837.

In the instant matter, the plaintiff does not allege that he suffered any harm; therefore, he has not sufficiently alleged a failure to protect claim. *Walzier v. McMullen*, 333 F. App'x 848, 851 (5th Cir. 2009) (per curiam) (no failure to protect claim absent a showing of harm); *Caldwell v. Dallas County*, 71 F. App'x 354, 355 (5th Cir. 2003) (per curiam) (affirming summary judgment on failure to protect claim where "the evidence demonstrated that [the plaintiff] did not suffer an injury that was more than *de minimis.*") The plaintiff should be allowed to amend his Complaint in this regard to allege what physical harm, if any, he suffered due to the attack by inmate Jones on or about April 21, 2022.

### *Monetary Damages*

With regards to any compensatory damages the plaintiff may be seeking for violation of his First Amendment rights, 42 U.S.C. § 1997e(e) bars claims for compensatory damages for a First Amendment violation without a prior showing of physical injury. *See Geiger v. Jowers,* 404 F.3d 371, 374–75 (5th Cir.2005). As such, if the plaintiff cannot amend his Complaint to assert that he suffered a physical injury due to the attack by inmate Jones, he cannot recover

compensatory damages for that First Amendment claim. Nominal and punitive damages would still be available.

**Recommendation**

It is the recommendation of the Magistrate Judge that the defendants' Motion to Dismiss (R. Doc. 27) be GRANTED IN PART, dismissing the plaintiff's claims for monetary damages asserted against the defendants in their official capacities, and all of the plaintiff's individual capacity claims except for the following: (1) plaintiff's Eighth Amendment claim against defendant Johnson for the attack by a fellow inmate (for which the plaintiff should be granted 21 days to amend his Complaint to allege what physical injuries, if any, he suffered due to the attack); (2) plaintiff's First Amendment retaliation claim, asserted against defendants Landry, Russ, Johnson, and Linzy, with regards to the filing of his Lost Property Claim; and (3) plaintiff's First Amendment retaliation claim, asserted against defendants Landry, Russ, Johnson, and Linzy, with regards to the filing of his grievance against defendant Johnson. It is further recommended that this matter be referred back to the Magistrate Judge for further proceedings herein.

Signed in Baton Rouge, Louisiana, on February 5, 2024.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**